**ALLERGAN, INC.; Allergan Sales, Inc., Plaintiffs,**

v.

**ALCON LABORATORIES, INC.; Alcon Research, Ltd.; Alcon Universal, Ltd.; Bausch & Lomb, Inc., Defendants.**

**No. SA CV 02–40 DOC.**

United States District Court, C.D. California.

May 8, 2002.

Frank P. Porcelli of Fish & Richardson, Boston, MA; Todd G. Miller and Dina Grinshpun of Fish & Richardson. San Diego, CA; Jonathan E. Singer and Chad A. Hanson of Fish & Richardson, Minneapolis, MN Allergan, Inc. and Allergan Sales, Inc. v. Alcon Laboratories, Inc.

Daniel J. Thomasch and Veronica Mullally of Orrick Herrington & Sutcliffe, New York, NY; William W. Oxley of Orrick Herrington & Sutcliffe, Los Angeles, CA; Lisa Marie Schull of Orrick Herrington & Sutcliffe, San Francisco, CA., for Alcon Laboratories, Inc.; Alcon Research, Ltd.; and Alcon Universal, Ltd.

John B. Hurlbut, Jr. of Rutan & Tucker, Costa Mesa, CA; Robert L Baechtold, Scott K Reed, Bruce M Wexler, and F. Christopher Mizzo of Fitzpatrick Cella Harper & Scinto, New York, NY; Michael K O'Neill of Fitzpatrick Cella Harper & Scinto, Costa Mesa, CA; Denis A Polyn, Rochester, N.Y. for Bausch & Lomb, Inc. (not a party to the motion).

## ORDER GRANTING ALCON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

CARTER, District Judge.

Before the Court is Defendants' Alcon Laboratories, Inc., Alcon Research, Ltd., and Alcon Universal, Ltd.'s (collectively Alcon) motion for summary judgment on Plaintiffs' Allergan, Inc. and Allergan Sales, Inc.'s (collectively Allergan) complaint for patent infringement. After reviewing the moving, opposing, and replying papers, after oral argument on April 29, 2002, and for the reasons set forth below, the Court GRANTS Alcon's motion.

## I.

## BACKGROUND

### A. Glaucoma

Open-angle glaucoma, the most common form of glaucoma, is a disease of the eye that leads to a gradual loss of vision. Glaucoma is caused by damage to optical cells. As those cells are damaged, vision becomes impaired. Generally, individuals that suffer from glaucoma lose their peripheral vision and subsequently develop blind spots at the sides. If not arrested, it may lead to blindness. Risk factors for glaucoma have traditionally included people with diabetes, high blood pressure, near sightedness, a family history of glaucoma, and black and elderly people. Treatment at the early stages of glaucoma is important because damaged cells cannot be repaired.

The human eye works when light enters through the cornea, passes through the pupil, and then travels through the lens and the vitreous body to the retina and the optic nerve. The optic nerve then carries the images to the brain for interpretation. The eye produces a watery fluid called aqueous humor that nourishes the eye's internal structures. Aqueous humor is continuously produced and drained between the lens and the vitreous body. When the drainage does not keep up with the production, the fluid backs up causing increased pressure in the eye, called intraocular pressure (IOP). For decades, the traditional view of the medical profession was that glaucoma was caused by an abnormally high IOP, which pushed against the optic nerve causing it to be damaged. Treatment for glaucoma thus consisted of reducing IOP.

Research has shown that the drug brimonidine, sold by Allergan under the trade name Alphagan®, reduces IOP. Alphagan® therefore became a leading drug to treat glaucoma.

In recent years, however, the medical science view of glaucoma has changed. Scientists discovered that patients with lower IOP's were still contracting glaucoma. Some evidence has since shown that the disease may originate from the optic nerve itself. Scientists are now increasingly thinking of glaucoma as a neurodegenerative disease.

In the early 1990's, Allergan scientists discovered that brimonidine had neuroprotective properties such that applying it to nerve cells make them less susceptible to injury and degeneration than those not treated with brimonidine. Thus, Alphagan® may be a potent treatment for glaucoma as a neuroprotective agent under this new view of the disease.

### B. New Drug and Generic Drug Application Procedures

The Drug Price Competition and Patent Term Restoration Act of 1984, also known as the Hatch–Waxman Act, was adopted by Congress to address the need to bring generic drugs to the market quickly and changed the way in which the Food and Drug Administration (FDA) approved the manufacture and use of new and generic drugs. *See Glaxo, Inc. v. Novopharm,*

*Ltd.,* 110 F.3d 1562, 1568 (Fed.Cir.1997). One of the most important aspects of the Hatch–Waxman Act was to "make available more low cost generic drugs." *Id.* (quoting H.R.Rep. No. 98–857(I), at 14–15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2647–48).

In order to market a new drug, the maker of the drug must obtain approval from the FDA. 21 U.S.C. § 355(a). In order to obtain FDA approval, the maker must submit a New Drug Application (NDA) which includes extensive information and testing of the new drug to insure its safety. See 21 U.S.C. § 355(b). Once the NDA is approved, the holder of an approved NDA is automatically granted a five-year period of exclusivity in marketing its drug. 21 U.S.C. § 355(c)(3)(D)(ii). That period of exclusivity is extended by an additional six months if the maker conducts certain tests to insure its safety and efficacy in children. 21 U.S.C. § 355a(a)(1)(i). During this period of exclusivity, the FDA may not grant any other drug maker a license to manufacture and sell the same drug or its bioequivalent. This period of exclusivity is intended to recognize the efforts and costs that the drug maker undertook in the first place to test and insure the safety and efficacy of a new, or pioneer, drug.

Near the end of that period of exclusivity, a drug maker may file an Abbreviated New Drug Application (ANDA). *See* 21 U.S.C. § 355(j). A party submitting an ANDA need only show that the proposed new drug is the same, or the bioequivalent, of the pioneer drug.

During the ANDA process, a generic drug maker must certify that the pioneer drug is either: (i) not patented (Paragraph I Certification); (ii) protected by a patent that has expired (Paragraph II Certification); (iii) patented, but setting forth the date the patent will expire (Paragraph III Certification); or (iv) that the pioneer

drug's patent is either expired or will not be infringed by the generic drug (Paragraph IV Certification). *See* 21 U.S.C. § 355(j)(2)(A)(vii). An ANDA with either Paragraph I or II certification may be quickly approved and marketed as soon as all regulatory requirements are met. An ANDA with Paragraph III Certification may not be approved until the relevant patents have expired.

Paragraph IV Certification, however, creates a different set of procedures. Under Section 202 of the Hatch–Waxman Act, Congress has specifically exempted a party that uses a patent in order to prepare an application for commercial marketing of a drug from liability for infringement. 35 U.S.C. § 271(e)(1). However, the submission of an ANDA is an act of infringement. 35 U.S.C. § 271(e)(2)(A). This infringement is "highly artificial." *See Eli Lilly and Co. v. Medtronic, Inc.,* 496 U.S. 661, 676, 110 S.Ct. 2683, 2691, 110 L.Ed.2d 605 (1990). Congress enacted this statutory scheme in order to allow generic drugs to come to the market as quickly as possible. *See id.* By allowing a generic drug maker to use the patent as it prepares to obtain FDA approval, the drug maker can bring the generic drug to market as soon as the patent expires, rather than waiting for the patent to expire before undertaking years of regulatory hurdles. By the same token, allowing the filing of the ANDA to amount to an act of infringement, the validity of a patent can be challenged before the drug comes to market. A party submitting an ANDA with a Paragraph IV Certification must inform the drug and patent owner of the application. *See* 21 U.S.C. § 355(j)(2)(B)(i). The patent owner then has 45 days in which to file an action for infringement, the basis of which is the "artificial" act of infringement of filing an ANDA. If the patent-holder does not sue for infringement, the ANDA may be quickly approved and marketed as soon as all

regulatory requirements are met. If the patent-holder does file suit, the ANDA may not be approved until either the date that the Court determines either invalidity or non-infringement, the date the patent expires, or 30 months (subject to modification by the Court) after the ANDA patent holder receives notice of the Paragraph IV Certification.

## C. Allergan's NDA for Alphagan® (Brimonidine)

On September 6, 1996, Allergan obtained FDA approval of its NDA, granting approval for the manufacture and sale of Alphagan® for reducing IOP, in accordance with a specific set of labeling instructions. Allergan was entitled to a five year period of exclusivity under 21 U.S.C. § 355(c)(3)(D)(ii) and an additional six month period under 21 U.S.C. § 355a(a)(1)(i). Brimonidine, however, was not protected by a patent, and thus Allergan's period of exclusivity was originally set to expire March 6, 2002.

Before that time elapsed, however, Allergan scientists discovered the neuroprotective properties of brimonidine. Accordingly, in 1999 and 2000, Allergan applied for patents covering this new use of brimonidine. In 2001, Allergan was granted U.S. Patents Nos. 6,194,415 (the '415 Patent) and 6,248,741 (the '741 Patent), both of which are continuations in part of U.S. Patent No. 5,856,329 (the '329 Patent).

The '415 and the '741 Patents (the patents at issue in this case) both claim a method of using brimonidine for treating ocular neural injury. During the prosecution of the patents at issue, Allergan initially attempted to claim the use of brimonidine to reduce IOP. The patent examiner rejected those claims as being obvious. Allergan then limited its claims to

a method of using brimonidine as a neuroprotective agent to treat glaucoma. Allergan then listed the patents in the "Orange Book," a record maintained by the FDA to provide notice to manufacturers of generic drugs that the maker of an approved new drug claims that the drug is also protected under the patent laws.[1]

In October 2001, Alcon filed an ANDA with the FDA, seeking to sell a generic brimonidine solution for use in reducing IOP with the same FDA labeling requirements approved for Alphagan®. Because the '415 and the '741 Patents were both listed in the Orange Book, Alcon filed a Paragraph IV Certification claiming that its drug was non-infringing or that the patents were invalid. Alcon notified Allergan on November 29, 2001 and Allergan brought suit within the statutorily required 45 days on January 9, 2002. Alcon now moves for summary judgment based on its argument that its proposed generic drug, labeled for use as an IOP reducing agent, but not as a neuroprotective agent, does not infringe the patents at issue.

The result of listing the '415 and '741 Patents in the Orange Book was obviously advantageous to Allergan. Under the terms of its NDA approval, its five year period of exclusivity for the sale of brimonidine under the name Alphagan® would have expired in March 2002. If, however, it can successfully claim protection under the Patent Act, it will be able to retain exclusive rights to brimonidine for the twenty year period prescribed under the Patent Act, through 2015. If successful in this litigation, Allergan will retain the exclusive rights to manufacture brimonidine, even when the proposed use by Alcon is for reduction of IOP. Allergan will effectively be able to retain the exclusive rights

---

1. Listing in the "Orange Book" is entitled to no presumption about the validity of the drug or patent owner's claims, and is a ministerial act on the part of the FDA. *See Ben Venue Labs., Inc. v. Novartis Pharm. Corp.,* 10 F.Supp.2d 446, 456 (D.N.J.1998).

to use brimonidine for a purpose that the Patent Office determined that it could not patent.

## II.

## LEGAL STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

The Court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, the existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; to defeat the motion, the non-moving party must affirmatively set forth facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Id.* at 256, 106 S.Ct. at 2514. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence of a genuine issue of material fact from the non-moving party. *Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.*, 200 F.3d 795, 806–07 (Fed.Cir.1999). The moving party need not disprove the other party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

## III.

## DISCUSSION

### A. Elements of Infringement

Determining whether there is infringement in a case requires a two step analysis. *Glaxo*, 110 F.3d at 1565. "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576, (Fed. Cir.1993). Claim construction is a question of law for the Court to determine in the first instance. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979–81 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Once the claim is properly construed, determining whether a particular device infringes the patent is a question of fact. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983). To prove infringement, a patentee must show that every limitation of the claims asserted to be infringed is found in the accused device. *Glaxo*, 110 F.3d at 1565.

### B. Claim Construction

Here, there is no material dispute as to the claims of the patents at issue. Both

sides agree that the patents at issue claim the neuroprotective use of brimonidine, but not its use to reduce IOP.[2]

## C. Infringement Under Section 271(e)(2)

"Allergan contends that defendants have and will infringe at least Claim 2 of the '415 patent and Claim 1 of the '741 patent." (Allergan's Mem. of P. & A. in Opp'n to Mot. for Summ. J. at 5.) Allergan's assertions of infringement are two-fold. First, Allergan argues that by filing the ANDA, Alcon has committed infringement under Section 271(e)(2)(A). Second, Allergan argues that Alcon will induce infringement by doctors prescribing generic brimonidine in violation of 35 U.S.C. § 271(b).

The primary question presented in this motion is whether Allergan can, as a matter of law, bring either of these claims at this time. If it can, the record currently before the Court is sufficient to present a triable issue of fact, or at the least, allow Allergan to conduct discovery under Federal Rule of Civil Procedure 56(f) before its claim is adjudicated.

This question of law, however, is one of nearly first impression. The Court is aware of only two cases in the country, neither reported, that have squarely addressed the issue of whether a holder of a patent for a method of using a drug in the public domain can sue a generic manufacturer for infringement based solely on filing an ANDA under Section 271(e). *See Warner–Lambert Co. v. Apotex Corp.*, No. 98 C 4293, 1999 WL 259946 (N.D.Ill. Apr.8, 1999); *see also In re Omeprazole Patent Litigation*, MDL Docket No. 1291 (S.D.N.Y. July 2, 2001) (Slip op. at 25). The problem is made worse by the somewhat awkward wording of the statute. In-

deed, the Supreme Court has stated that "[n]o interpretation we have been able to imagine can transform § 271(e)(1) into an elegant piece of statutory draftsmanship." *Eli Lilly*, 496 U.S. at 679, 110 S.Ct. at 2693. Therefore, to fully understand the extent of Section 271(e), a brief review of its history and purpose are appropriate.

### 1. Legislative Background of the Hatch–Waxman Act and Section 271(e)(2)

The Hatch–Waxman Act encompassed two different legislative issues that developed during the late 1970's. The first problem addressed by the bill was a method for bringing popular generic drugs to the market more quickly. H.R.Rep. No. 98–857(I) at 14, 1984 U.S.C.C.A.N. at 2647. The regulatory delay in bringing new generic drugs to the market keeps drug prices artificially high. The higher prices had particularly negative affects on senior citizens and drove up the cost of federal medicare and medicaid programs. *Id.* at 19–21, 1984 U.S.C.C.A.N. at 2652–53. As early as 1978, the FDA had considered regulatory action to allow for some abbreviated application. *Id.* at 16, 1984 U.S.C.C.A.N. at 2649. After several years of waiting, Congress took action itself just prior to the 1984 Presidential Election.

The Hatch–Waxman Act also responded to complaints by patent owners that the patent term for certain products, such as drugs, was effectively eroded because patent holders could not exploit their inventions while the drugs went through the long period of regulatory approval. H.R.Rep. No. 98–857(II) at 3 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2686, 2687; *see also Eli Lilly*, 496 U.S. at 669, 110 S.Ct. at 2688.

---

**2.** Allergan argues that the patents at issue do not claim the use of brimonidine *solely* to reduce IOP. Although the Court does not interpret the claim in that manner, the distinction is ultimately immaterial for disposition of the present motion.

Attempts to address this problem had lingered since the 96th Congress (1979–80). H.R.Rep. No. 98–857(II) at 3, 1984 U.S.C.C.A.N. at 2687. Although the Senate passed legislation covering the area in 1982, it was thwarted in the House of Representatives on procedural grounds in September 1982. *Id.*

Hearings on the generic drug aspect of the legislation were held in the Committee of Energy and Commerce, Subcommittee on Health and the Environment in July 1983. After the subcommittee favorably reported the bill, Representative Henry Waxman of California conducted extensive negotiations with representatives of both generic and brand name pharmaceutical companies that generated a compromise that addressed the generic marketing and patent term aspects. This compromise was the basic language of the bill that became the Hatch–Waxman Act. *Id.* at 4, 1984 U.S.C.C.A.N. at 2688. Nearly a year later, the full committee marked-up the bill and adopted the compromise without further hearings. H.R.Rep. No. 98–857(I) at 16, 1984 U.S.C.C.A.N. 2649.

During the intervening time, in April 1984, the Court of Appeals for the Federal Circuit issued its decision in *Roche Products, Inc. v. Bolar Pharmaceuticals. Co., Inc.,* 733 F.2d 858 (Fed.Cir.1984). There, the court rejected the argument that using a drug for testing in order to prepare an application for approval from the FDA was a non-infringing use. *Id.* at 864–65. The Federal Circuit specifically held that it was up to Congress to address this concern. *Id.* This created a second distortion to the 17 year patent term[3] because competitors could not begin testing or seeking regulatory approval for their competing generic drugs until the patents of the pioneer

drugs expired and thus could not compete in the marketplace for several years. *See Eli Lilly,* 496 U.S. at 670, 110 S.Ct. at 2688.

The Hatch–Waxman Act set out to correct these two distortions. Section 201 of the Hatch–Waxman Act provided for an extension of patents for certain drugs for up to five years to address the problem of the distorted patent term on the front end. *Id.* After the Federal Circuit issued its opinion in *Roche Products,* 733 F.2d 858, Section 202 was included in the bill, which added Section 271(e) to the Patent Act and was designed to address the distortion that effectively extended the patent term on the back end. *See Eli Lilly,* 496 U.S. at 671, 110 S.Ct. at 2689.

Hearings on Section 271(e) were held in the House Judiciary Committee, which was ordered to report on the bill within six weeks. H.R.Rep. No. 98–857(II) at 3, 1984 U.S.C.C.A.N. at 2687. The committee did not undertake a detailed examination of the type of claims that could be brought under Section 271(e)(2), but instead focused on whether Section 271(e)(1) amounted to an unconstitutional taking under the Fifth Amendment.[4] The Judiciary Committee reported the bill to the House on August 1, 1984.

In the intervening time, concerns about the bill were still being sounded by large pharmaceutical companies and the Patent and Trademark Office. The reservations threatened the bill's passage. *See* 130 Cong. Rec. 23,774 (1984) (statement of Sen. Baker). Senator Orrin Hatch of Utah, then chairman of the Senate Labor and Human Resources Committee, was Waxman's co-sponsor and had shepherded the bill through the Senate. In the waning

---

**3.** The term of a patent has since been extended to 20 years.

**4.** The House Judiciary Committee rejected that position, and the Supreme Court appears to have agreed in *Eli Lilly,* 496 U.S. at 678, 110 S.Ct. at 2693 n. 7.

days before the August recess, Hatch engaged in several marathon negotiating sessions in an effort to save the legislation. *Id.* Hatch's efforts were ultimately successful and led to several changes to the bill that kept intact its fundamental purpose of bringing generic drugs to the market quickly while maintaining broad bipartisan support. 130 Cong. Rec. 23,764 (1984). These changes included granting a five-year period of exclusivity in marketing of new, unpatented drugs, codified at 21 U.S.C. § 355(c)(3)(D)(ii), in order to give incentives to drug makers to develop new medications; extending the period during which the FDA has to delay approval of an ANDA if a patentee brings suit under Section 217(e)(2) from 18 to 30 months, and clarifying the FDA's authority to disapprove ANDAs that are not identical to the pioneer drugs and in cases where the FDA is taking steps to remove the pioneer drug from the market. 130 Cong. Rec. 24,425. Having reached this compromise, the House passed the measure on September 6, 1984. The Senate followed six days later, and on September 24, 1984, President Reagan signed the Hatch–Waxman Act.

## 2. Jurisdictional Nature of Section 271(e)

■ Section 271(e)(2) provides in part that "[i]t shall be an act of infringement to submit an [ANDA] for a drug claimed in a patent or the use of which is claimed in a patent ...." 35 U.S.C. § 271(e)(2)(A). Alcon admits [5] that its ANDA seeks approval for a drug for which Allergan has a valid patent claiming a method of use. Thus, Allergan argues that a "finding of no literal infringement ... is potentially foreclosed in its entirety by the statute." (Allergan's Mem. of P. & A. in Opp'n to Mot. for Summ. J. at 10.) Allergan's literal reading of the statute is naturally problematic, as it would create a new and more expansive definition of infringement, and would appear to exclude traditional defenses such as invalidity and non-infringing use.[6] The Federal Circuit has also foreclosed this argument. In *Glaxo*, 110 F.3d at 1567, the Federal Circuit stated that "[t]he plain language of the statute does not alter a patentee's burden of proving infringement, nor does it mandate an infringement analysis limited to the scope of the [ANDA] approval sought."

The difficulty in a patent case brought under Section 271(e)(2) is that the allegedly infringing acts have not yet occurred. *Id.* The Court must engage in a hypothetical evaluation to determine what "is likely to be sold, or, preferably, what will be sold." *Id.* If the drug that will be sold upon approval of the ANDA is infringing, then the infringing maker will not be allowed to obtain approval of its ANDA. Ordinarily, such a hypothetical determination would run afoul of the "case or controversy" requirement of Article III. U.S. Const. art. III, § 2. Section 271(e)(2) therefore provides no new substantive law, but much like the Declaratory Judgment Act, 28 U.S.C. § 2201, merely provides a jurisdictional "hook" for a patent case. *Glaxo*, 110 F.3d at 1569 (" § 271(e)(2) provided patentees with a defined act of infringement sufficient to create case or controversy jurisdiction....")

---

**5.** Alcon's admissions are limited for use in the present motion only.

**6.** At oral argument, Allergan insisted that it was not urging the Court to disregard the defense of invalidity. Nevertheless, that is the logical conclusion of Allergan's argument, as a literal reading does not encompass the invalidity defense. *Compare* 35 U.S.C. § 271(a) ("Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention ... infringes the patent") *with* 35 U.S.C. § 271(e)(2).

### 3. Scope of Claims that Can be Brought Under Section 271(e)(2)

■ Allergan argues that even if the submission of an ANDA does not constitute infringement per se, the Court must focus on whether it is likely that its patents will be infringed if Alcon is allowed to market its generic brimonidine, even though Alcon would not be the party using the drug in violation of Allergan's patent rights. Allergan's arguments, and the cases it relies on, tend to conflate the concepts of direct infringement under Section 271(e)(2) and inducing infringement under Section 271(b). The Court therefore sets out these two distinct arguments.[7]

#### i. Direct Infringement

■ There is no question that, under a traditional infringement analysis, Alcon has not and will not infringe Allergan's patents. Alcon has made and seeks to sell the drug brimonidine, an old drug which has fallen into the public domain. As distinguished from the facts in *Glaxo*, where the plaintiff owned a patent that claimed both the compound per se and a method of creating it, *id.* at 1564, Allergan does not own a patent in the chemical brimonidine. Instead, the '415 and '741 Patents claim methods for using brimonidine. Under a traditional analysis, Allergan's patents will only be infringed if prescribing physicians use brimonidine as a neuroprotective agent, something Alcon cannot do.

Allergan's argument must therefore be based on an interpretation of the Hatch–Waxman Act as giving a pioneer drug maker/patentee a remedy against the generic drug maker for a wrong that will be committed in the future by someone else.

As set forth above, Section 271(e)(2) provides that "[i]t shall be an act of infringement to submit an [ANDA] for a drug . . . the use of which is claimed in a patent . . . ." 35 U.S.C. § 271(e)(2)(A). When looking at this language in isolation, an argument can be made that by enacting this statute, Congress was seeking to address precisely the situation now before the Court-a pioneer drug manufacturer such as Allergan invests substantial sums of money into research to find a new way to use an old drug. Although it cannot obtain a patent for the drug itself, as it has fallen into the public domain, it does obtain a patent on this new method of using the drug, one which may well save significant suffering. But since the product itself was not patented, the generic drug manufacturer can swoop in, mass produce the drug, and leave physicians to their own devices as to how to prescribe the medicine.

Congress, one could argue, knew that it would be both impractical and bad business for the pioneer manufacturer to sue thousands of doctors across the country for patent infringement. Thus, it set up a no-fault system, disallowing the marketing of any generic drug if there is an unexpired patent claiming a method of using that drug, thereby stopping the infringing activity before it occurs. Unfortunately for Allergan, the structure of the Hatch–Waxman Act, its legislative history, and the specific problem that Section 271(e)

---

7. Allergan does not rely on a third possible ground, that Alcon would contributorily infringe the '415 and '741 Patents in violation of 35 U.S.C. § 271(c), as it concedes that brimonidine has non-infringing uses, specifically the reduction of IOP. In *Sony Corp. of America v. Universal City Studios, Inc. (The Betamax Case)*, 464 U.S. 417, 441–42 104

S.Ct. 774, 788 (1984), the Supreme Court examined the doctrine of contributory infringement in the context of patent law, and held that a party cannot be held liable as a contributory infringer if it manufactures a product that is adapted to non-infringing uses.

was meant to address do not allow for such an interpretation.

In April 1984, the Federal Circuit, in *Roche Products,* 733 F.2d 858, held that there was no "experimental use" defense to patent infringement. As the district court in *Roche Products* found, cases prior to the Federal Circuit's decision had found that such experimental use did not give rise to a claim for infringement, or at least would not require a court to issue an injunction. *Roche Prods., Inc. v. Bolar Pharms. Co., Inc.,* 572 F.Supp. 255, 258 (E.D.N.Y.1983) (citing *Kaz Mfg. Co., Inc. v. Chesebrough–Pond's, Inc.,* 211 F.Supp. 815 (S.D.N.Y.1962), *aff'd,* 317 F.2d 679 (2d Cir.1963); *Maxon Premix Burner Co. v. Eclipse Fuel Eng'g Co.,* 471 F.2d 308 (7th Cir.1972)). Congress then hastily drafted Section 271(e) to reverse the decision and complete its work on the issue before the fall election. Thus, while most of the Hatch–Waxman was considered over a period of nearly six years and through several congressional hearings, Section 271(e) was drafted and reported out of the House Energy and Commerce Committee in just over six weeks. The only congressional hearings on Section 271(e) were focused on the constitutional takings issue and not on the practical impact of the statute. The result, unsurprisingly, is a statute which even the Supreme Court has described as something less than an "elegant piece of statutory draftsmanship" requiring courts to engage in interpretation beyond the plain language. *Eli Lilly,* 496 U.S. at 679, 110 S.Ct. at 2693 (Scalia, J.).

In *Roche Products,* the patent at issue claimed the active ingredient in a prescription sleeping pill. 733 F.2d at 860. Unlike the present case, the patent claimed only the compound itself, not the use the drug. Thus, when drafting Section 271(e), Congress was primarily focused on exempting from infringement the use of a patented

drug, not the use of a patented method of using that drug.

The structure of the Hatch–Waxman Act as a whole also does not allow for Allergan's claim here. This claim arose because when Alcon submitted its ANDA for generic brimonidine, it filed a Paragraph IV Certification asserting that the patents listed in the Orange Book were either invalid or not infringed. Pursuant to the requirements of a Paragraph IV Certification, it notified Allergan of the ANDA, which gave Allergan notice that it needed to bring this suit within 45 days. Under the Hatch–Waxman Act, however, it does not appear that Alcon was even required to file a Paragraph IV Certification.

A certification under paragraphs I–IV is required to be filed "with respect to each patent which claims the listed [i.e. pioneer] drug ... or which claims a use for such listed drug for which the applicant is seeking approval ...." 21 U.S.C. § 355(j)(2)(A)(vii). In its report on the bill, the House Judiciary Committee set forth the process more clearly, stating that a certification under paragraphs I–IV was required only for "product patents ... and all use patents which claim an indication for the drug which the applicant is seeking approval." H.R.Rep. No. 98–857(II) at 13, 1984 U.S.C.C.A.N. at 2697. The Judiciary Committee described these as "Controlling Use Patents." Under this definition, it is clear that the '415 and '741 Patents are not Controlling Use Patents, as Alcon is not seeking approval for the indications claimed in those patents.

Furthermore, the House Energy and Commerce Committee explained that:

> if there are indications which are claimed by any use patent and for which the applicant is not seeking approval, then an ANDA must state that the applicant is not seeking approval for those indications which are claimed by such

use patent. For example, the listed drug may be approved for two indications. If the applicant is seeking approval only for indication No. 1, and not indication No. 2 because it is protected by a use patent, then the applicant must make the appropriate certification [under paragraphs I–IV] and a statement explaining that it is not seeking approval for indication No. 2.

H.R.Rep. No. 98–857(I) at 22, 1984 U.S.C.C.A.N. at 2656; *see also* 21 U.S.C. § 355(j)(2)(A)(viii). The example given by the House Energy and Commerce Committee is nearly identical to the situation now before the Court. Alcon is seeking approval to market brimonidine only for one indication, reducing IOP, and not for the second indication, as a neuroprotective agent,[8] because it is protected by a patent. Alcon therefore was not required under the law to file a Paragraph IV Certification.[9] It is the filing of a Paragraph IV Certification that puts into process the notice to the patentee allowing it to bring suit under Section 271(e)(2). It does not withstand scrutiny to conjecture that Congress intended to design a system where a patentee could bring suit to prevent the approval of an ANDA in cases where it did not require the ANDA applicant to notify the patentee.

Infringement actions under Section 271(e)(2) must therefore be limited to the Controlling Use Patents. An ANDA which seeks approval only for indications that are not claimed in a patent does not violate Section 271(e)(2). Because there are no such Controlling Use Patents here,

Alcon's ANDA does not directly infringe the '415 of '741 Patents.

### ii. Inducing Infringement

 Allergan alternatively argues that even if direct infringement cannot be shown, it has a right to prove that Alcon will, by sale of its generic brimonidine, induce infringement of the '415 and '741 Patents. Allergan claims that doctors who currently prescribe Alphagan® as a neuroprotective agent will prescribe Alcon's generic brimonidine not just to reduce IOP, but also for its neuroprotective use, thereby infringing Allergan's process patent.

Section 271(e), however, does not provide a predicate for Allergan to sue for inducing infringement. Although Allergan argues that Section 271(e) was enacted by Congress to provide a mechanism to adjudicate the issues of infringement before the generic drug comes to market, the purpose and effect of Section 271(e) is not so broad as Allergan would suggest.

Section 271(e) was designed to address the distortion to the end of the patent term that effectively extended a patentee's period of exclusivity. *Eli Lilly*, 496 U.S. at 671, 110 S.Ct. at 2689. Section 271(e)(1) exempts a party from liability for infringement if it makes, uses or sells a patented drug solely for the purpose of developing a generic drug to obtain regulatory approval. 35 U.S.C. § 271(e)(1). Section 271(e)(2), however, creates what the Court has called a "somewhat artificial [ ] act of infringement," *Eli Lilly*, 496 U.S. at 676, 110 S.Ct. at 2691, when a party files an application

---

8. In the present case, however, the second indication for using brimonidine as a neuroprotective agent is not even approved by the FDA.

9. As a practical matter, however, filing the Paragraph IV Certification was the most prudent route given that the '415 and '741 Patents were listed in the Orange Book. It is

worth noting that the regulations issued by the FDA suggest that the '415 and '741 Patents should not have even been listed in the Orange Book. The regulations, found at 21 C.F.R. § 314.53(b) provide that "[f]or patents that claim a method of use, the applicant shall submit information only on those patents that claim indications or other conditions of use of a pending or approved application."

to use that drug. 35 U.S.C. § 271(e)(2). The result is to bar a patent holder from suing for infringing use during the development and testing stage, but allow the patentee to sue under an expedited process once the infringer files for approval of the drug. Thus, what Congress taketh away in Section 271(e)(1), it giveth in Section 271(e)(2). The Court must therefore conclude that the type of claims that accrue upon the filing of an ANDA are limited to those claims that would have accrued earlier, when a generic drug maker used the patent to develop its generic drug.[10]

Viewed as such, a patent-holder cannot bring a claim under Section 271(e)(2) that the generic drug maker will, upon approval of the patent, induce others to infringe. As Allergan points out, the elements for inducing infringement are infringement by a third-party and "intent to encourage another's infringement." *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed.Cir.1990); *see also* 35 U.S.C. § 271(b). Had Section 271(e) not been enacted, Allergan in this case would have been able to sue Alcon for infringement for using its patent in the development of a generic drug. It could not, however, sue Alcon for inducing infringement because there was yet to be any third-party infringement and thus the question of induc-

ing infringement would be entirely too speculative.[11]

Allergan's argument that Section 271(e)(2) is the predicate act of infringement is circular. The only predicate act of infringement that Allergan alleges is Alcon's own filing of the ANDA.[12] Allergan argues that this allows the Court to examine what acts of infringement, including inducing infringement, Alcon will commit.

Allergan points to two unpublished district court decisions that it contends support its argument. *See Warner–Lambert*, 1999 WL 259946;[13] *see also In re Omeprazole Patent Litig.*, MDL Docket No. 1291 (citing *Warner–Lambert*, 1999 WL 259946, at \*3). Both cases, like Allergan's argument here, conflate the issue of infringement under Section 271(e)(2) and the predicate act of infringement necessary to support a claim for inducing infringement. The district court in *Warner–Lambert* stated:

> Except for the district court's use of an *a priori* viewpoint, the court's "inquiry in a suit brought under § 271(e)(2) is the same as it is in any other infringement suit...." Thus, in support of a suit brought under section 271(e)(2), a patent owner may rely on the theory that the commercial manufacture, use, or sale of

---

**10.** Allergan contends that this view of Section 271(e)(2) improperly looks backwards in time whereas *Glaxo* requires the Court to look to what will happen in the future. 110 F.3d at 1570. This is a misunderstanding of the Court's analysis. The Court is not looking backwards to determine whether there had been infringement, but merely looking backwards to see what causes of action Congress determined were justiciable under the Hatch–Waxman Act.

**11.** Allergan argues that prior to the Hatch–Waxman Act, Alcon would have had to conduct clinical trials and distribute the drug to hundreds of doctors to use, thereby inducing their infringement. The argument fails because that type of inducing infringement

would not be speculative. The underlying infringing acts and the acts inducing the infringement would have already happened and the Court would not be forced to speculate on future actions by parties.

**12.** It is undisputed that no prescribing physician has infringed Allergan's patents in either a traditional manner or by filing an ANDA.

**13.** *Warner–Lambert* is not entirely favorable to Allergan, as the district court there, in a subsequent decision in that case, found that a claim for literal infringement under Section 271(e)(2) was foreclosed. *Warner–Lambert Co. v. Apotex Corp.*, No. 98 C 4293, 2001 WL 1104618, \*3 n. 3 (N.D.Ill. Sept.14, 2001).

a drug claimed in a patent or the use of which is claimed in a patent will actively induce the infringement of the owner's patent.

1999 WL 259946, at *3 (quoting *Glaxo*, 110 F.3d at 1569). While correct that the Court's inquiry under Section 271(e)(2) must be the same as in any other infringement suit, the remainder of this statement is erroneous for four reasons. First, the "exception" that the district court notes is a very important one indeed. As a practical matter, the *a priori* viewpoint of the Court requires it to speculate into what promotional efforts Alcon will undertake if its ANDA is approved and whether the physicians will then actually infringe the patent by prescribing its use as a neuroprotective agent. The speculation is not only practically difficult, but is constitutionally problematic. Because there has not been even a predicate act of infringement by the prescribing physicians, there is not a sufficiently immediate threat that there will be a violation of the patent laws so as to warrant judicial determination. *See Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). Thus, allowing a patentee to bring a claim for inducing infringement under Section 271(e)(2) runs afoul of the "case or controversy" requirement of Article III. U.S. Const. art. III, § 2.

Second, *Warner–Lambert* and *Omeprazole* both give a broad construction to Section 271(e)(2), yet it is well settled that "[s]tatutes purporting to confer federal subject matter jurisdiction must be narrowly construed, with ambiguities resolved against the assumption of jurisdiction." *Mars Inc. v. Kabushiki–Kaisha Nippon Conlux*, 24 F.3d 1368, 1373 (Fed.Cir.1994). Thus, even if a district court could, consistent with Article III, hear a case of inducing infringement when there has not yet been any third-party infringement, Congress must make a very explicit grant of jurisdiction. Section 271(e)(2) provides no such explicit grant.

Third, the court in *Warner–Lambert* did not examine Section 271(e) in light of the entirety of the Hatch–Waxman Act. The court there stated that "[n]owhere does the statute require that the proposed use of the generic drug be within the scope of the uses claimed in the patent in question for infringement to occur." 1999 WL 259946, at *3. This statement is plainly erroneous. Although it is not specifically stated in Section 271(e)(2), the Hatch–Waxman Act includes exactly this requirement, as the Court has set forth in part III.C.3.i, *supra*. In addition, Section 271(e)(4)(A) provides that the exclusive remedy for this case brought under Section 271(e)(2) is to delay FDA approval of the ANDA until the patents at issue expire. Even Allergan admits that the mere production of generic brimonidine does not infringe its patents, but that it must prove that Alcon has taken steps that would actively induce infringement. Yet the remedy for cases under Section 271(e)(2) would prevent the production of generic brimonidine and not address at all Alcon's active inducement. The result is akin to using a sledgehammer to squash an ant. If Congress had intended for Section 271(e)(2) to allow a claim for inducing infringement, it is fair to assume the remedy it prescribed would address the inducement.

Finally, neither the of the district courts in *Warner–Lambert* nor in *Omeprazole* examined the purpose of the Hatch–Waxman Act that created Section 271(e). As set forth above, the purpose of the Hatch–Waxman Act was to bring low cost generic drugs to market more quickly by exempting certain research uses from patent infringement liability, while still providing a jurisdictional "hook" for patentees to make their infringement claims before the drugs come to market. Accepting the interpre-

tation of Section 271(e)(2) urged by Allergan, and adopted by the *Warner–Lambert* and *Omeprazole* courts, would not only allow a patentee to sue for those acts of infringement that, prior to the Hatch–Waxman Act, the patentee could have brought during the development of the drug, but would also allow the patentee to sue for inducing an infringement that has not yet occurred. This interpretation turns the Congress's intent on its head. It would allow a pioneer drug manufacturer greater remedies than it had prior to the Hatch–Waxman Act and would allow them to block the manufacture of generic drugs by claiming inducing infringement whereas prior to the Hatch–Waxman Act, they could not.[14]

### IV.

### CONCLUSION

Accordingly, Alcon's motion for summary judgment on Allergan's complaint is GRANTED.

IT IS SO ORDERED.

---

**14.** The result might be even more perverse in the present case, because if Allergan were to succeed, it would be able to effectively monopolize the market on all manufacture and use of brimonidine even though it admittedly can have no patent on the manufacture of brimonidine, and only has a patent on one of many uses for the drug.