**TEGAL CORPORATION,**
**Plaintiff–Appellee,**

v.

**TOKYO ELECTRON COMPANY,**
**LIMITED, Defendant,**

**and**

**Tokyo Electron America, Inc.,**
**Non party-Appellant.**

**No. 00–1239.**

United States Court of Appeals,
Federal Circuit.

May 14, 2001.

Jon B. Streeter, Keker & Van Nest, L.L.P., of San Francisco, CA, argued for plaintiff-appellee. With him on the brief was Steven A. Hirsch. Of counsel on the brief were Warren E. Zirkle, of McLean, VA; and Robert M. Tyler, McGuire, Woods, Battle & Boothe LLP, of Richmond, VA.

Edgar H. Haug, Frommer Lawrence & Haug LLP, of New York, NY, argued for Nonparty–Appellant. With him on the brief were Steven M. Amundson, and Robert E. Colletti. Of counsel was Dabney J. Carr, IV, Mays & Valentine L.L.P., of Richmond, VA.

Before LOURIE, BRYSON, and LINN, Circuit Judges.

BRYSON, Circuit Judge.

Tokyo Electron America, Inc., ("TEA") appeals from an order holding it in contempt of court for violating an injunction entered by the United States District Court for the Eastern District of Virginia. Because there is no evidence that TEA violated the injunction, we reverse.

## I

The injunction at issue in this case was entered at the conclusion of a patent infringement action brought by Tegal Corporation against TEA and other defendants. Following a three-day bench trial, the court entered judgment against TEA, holding that by selling the IEM model plasma etching system in the United States, TEA had willfully infringed U.S. Patent No. 4,464,223 ("the '223 patent"), which relates to plasma etching equipment that is used in fabricating semiconductor chips. In addition, the court held that TEA had contributed to and induced the infringement of that patent by TEA's customers.

As part of the relief granted to Tegal, the district court enjoined TEA "from engaging in any further infringement or infringement by equivalents" of two claims of the '223 patent until the expiration of the patent. The court specifically barred TEA from "making, using, offering for sale, selling or importing any of the IEM model etching systems found to infringe" the two asserted claims of the '223 patent. The court then added that the infringing activities that were enjoined "include acts that constitute contributory infringement or inducement to infringement, such as participating in, rendering assistance, or any way facilitating infringing acts by related corporations or corporate affiliates or corporate parents, or conducting field service, testing or spare parts replacement or maintenance for customers that own infringing etching systems which were sold after October 1997."

Shortly after entry of the injunction, Tegal filed a petition to require TEA to show cause why it should not be held in contempt of court. In the petition, Tegal charged that TEA and its parent corporation, Tokyo Electron Company, Ltd., ("TEL") had violated the injunction entered in the litigation against TEA. Tegal alleged that TEA and TEL had arranged to transfer the function of servicing IEM model etching systems from TEA to Tokyo Electron Massachusetts, Inc., ("TEM") which is wholly owned by Tokyo Electron Yamanashita, Ltd., which in turn is owned by TEL. Based on its view that "[o]ne of them, at least [TEL or TEA], is responsible for the continued servicing of infringing etchers," Tegal asked the court to order both to show cause why they should not be held in contempt.

Following proceedings on the show cause order, the district court found TEA

and TEL in contempt of court for violating the injunction entered against TEA. The court reviewed the evidence that, after the injunction against TEA was entered, TEM serviced two IEM model etchers that TEA had sold after October 1997. The district court found that "[s]ince TEM is essentially a wholly owned subsidiary of TEL, TEL and TEA violated the terms of the injunction by permitting TEM to service the infringing machines." Because it found TEL's and TEA's contempt to be willful, the court directed TEL and TEA to pay Tegal's reasonable attorney fees and costs incurred in prosecuting the contempt petition.

## II

■ TEA appeals from the contempt citation. It argues that the district court abused its discretion in entering the contempt citation because there is no evidence to support the finding that TEA violated the injunction.

Tegal concedes that there is no evidence that TEA sold or serviced any infringing etcher after the injunction was entered. Instead, Tegal premises its argument that TEA violated the injunction on the contention that TEA had an affirmative obligation to stop any of its corporate affiliates from selling or servicing infringing etchers, regardless of whether TEA had any control over that affiliate.

■ Tegal's theory is that by taking no action to prevent it, TEA was guilty of "facilitating" infringement by its corporate affiliates. That also appears to be the basis on which the court found TEA to be in contempt. Facilitation, however, entails some affirmative act; it is not enough to show that TEA failed to take steps to prevent its corporate affiliates from servicing the IEM etchers. In the absence of a showing of control over another party, merely permitting that party to commit infringing acts does not constitute infringe-

ment, and it likewise cannot constitute "facilitating infringing acts."

The distinction between facilitation and permission is highlighted by the very cases relied on by Tegal. Those cases make clear that the term "facilitate," as used in the criminal context, requires some affirmative action such as using a telephone to "facilitate" a narcotics sale, *see United States v. Mertilus,* 111 F.3d 870, 872 (11th Cir.1997); *United States v. Aquilla,* 976 F.2d 1044, 1049 (7th Cir.1992) (telephone facilitation of a narcotics offense occurs when the telephone call makes the sale easier or less difficult or assists or abets the sale), or using property to "facilitate" a money laundering scheme, *see United States v. Hawkey,* 148 F.3d 920, 928 (8th Cir.1998) (property is "involved in" or facilitates a money laundering offense when use of the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance).

Tegal's assertion that inaction can constitute "facilitation" has no basis in any legal principle to which Tegal has directed us. Accordingly, in order to be held in contempt of court TEA must have taken some affirmative action to "facilitate" TEM's servicing of the infringing machines; it is not enough that TEA did not resist TEM's actions or successfully prevent them.

■ That conclusion is consistent with the statutory provision barring active inducement of infringement. *See* 35 U.S.C. § 271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer."). "Actively inducing," like "facilitating," requires an affirmative act of some kind:

> Of course inducement has connotations of *active steps knowingly taken*—knowingly at least in the sense of purposeful, intentional as distinguished from accidental or inadvertent. But with that

qualifying approach, the term is as broad as the range of actions by which one in fact causes, or urges, or encourages, or aids another to infringe a patent.

*Fromberg, Inc. v. Thornhill,* 315 F.2d 407, 411, 137 USPQ 84, 87 (5th Cir.1963) (emphasis added); *see also National Presto Indus., Inc. v. West Bend Co.,* 76 F.3d 1185, 1196, 37 USPQ2d 1685, 1693 (Fed. Cir.1996) (analogizing active inducement to aiding and abetting violations of criminal laws); *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1569, 30 USPQ2d 1001, 1010 (Fed.Cir.1994) (noting that jurisdiction for a claim of inducement cannot be premised on an *omission* because "active inducement of infringement requires the *commission* of an affirmative act"). In *A. Stucki Co. v. Worthington Industries, Inc.,* 849 F.2d 593, 7 USPQ2d 1066 (Fed.Cir.1988), we considered whether evidence of mere inaction by a parent company in the face of infringement by a subsidiary—i.e., a failure to stop infringement—could constitute either direct infringement or active inducement. In the absence of evidence showing that the parent company either was an alter ego of the subsidiary or controlled the conduct of the subsidiary, we refused to find direct infringement. *A. Stucki,* 849 F.2d at 596–97, 7 USPQ2d at 1068–69. We also concluded that evidence of mere inaction did not constitute inducement, and we therefore affirmed the directed verdict in favor of the defendant. *A. Stucki,* 849 F.2d at 597, 7 USPQ2d at 1069. Thus, Tegal's proposed construction of the term "facilitating" would encompass conduct not contemplated by the inducement statute.

Where courts have held enjoined parties in contempt for failing to prevent particular conduct, the finding of contempt ordinarily has been based on an affirmative obligation set forth in the underlying injunction. In *Consolidation Coal Co. v. United Mineworkers,* 683 F.2d 827 (4th Cir.1982), for example, the court found a local union and its officials in contempt of court for failing to take reasonable efforts to persuade miners to return to work, including failing to threaten or take disciplinary action against union members. The basis for that ruling, however, was that the temporary restraining order at issue specifically enjoined the union and its officials from "[e]ngaging in or continuing to engage in, supporting or encouraging, reinstituting, *by failing to take reasonable steps to end,* or otherwise, the current strike or work stoppage...." *Id.* at 828 (emphasis added); *see also In re Dolcin Corp.,* 247 F.2d 524, 534 (D.C.Cir.1956) (treasurer and secretary of corporation held in contempt of court for inaction because court imposed "an affirmative obligation on them, individually and as officers of Dolcin, to take all reasonable steps to effect compliance with this court's order"). The injunction at issue in this case does not impose any such affirmative obligation on TEA.

In the absence of express obligations to prevent particular conduct by others, courts have held parties in contempt based on the conduct of others, but in that circumstance they have required proof that the party subject to contempt sanctions had control over those who engaged in the conduct proscribed by the injunction. In *United States v. Johnson,* 541 F.2d 710 (8th Cir.1976), for example, the court held Johnson, the chief executive officer of a corporation, in contempt of court for permitting corporate salesmen to repeatedly violate an injunction prohibiting Johnson and the corporation from engaging in certain unfair trade practices. But the court there held that Johnson "formulated, directed and controlled" company operations and that the salesmen were acting as agents for Johnson. *Id.* at 712–13; *see also In re Dolcin,* 247 F.2d at 533 (officers "in control of the management, policies,

and operation" of corporation held in contempt of court for inaction). Like the union and union officials in *Consolidation Coal*, Johnson exercised a high degree of control over the actual wrongdoers, thus justifying holding him in contempt. There is no similar showing that TEA exercised a high degree of control—or any control at all—over TEM.

TEA is affiliated with TEM. But Tegal introduced no evidence that TEA formulates, directs, or controls TEM's operations or that it is in control of the management, policies, and operation of TEM. Tegal suggests that TEA could have sued TEL on a contract theory for breaching its right to service IEM etchers in the United States, or that it could have sued TEM on a tort theory such as interfering with the exclusive representation contract between TEL and TEA, and that TEA's failure to bring such an action constituted "facilitation" of infringement. We disagree. First, it is unclear that there has been any breach of the contract at issue. Although the contract between TEL and TEA provides that TEA is TEL's "exclusive" representative in the United States, TEL retains certain servicing rights under the contract: "TEL shall be responsible for the warranty service of the [infringing etchers and] . . . for the upgrade, modification and replacement of key components of the [infringing etchers] which may affect system performance and safety specification of the Products." In its interrogatory response in the litigation between TEL and Tegal, TEL described TEM's servicing activity as including "replacement of consumable parts." Second, Tegal offers no support for the proposition that a party violates an injunction against "facilitation" of unlawful conduct by others merely by failing to take legal steps to prevent or terminate that unlawful conduct. Again, the failure to take legal steps that could conceivably prevent particular conduct may "permit" the conduct to take place, but it does not constitute "facilitation."

Tegal makes the alternative argument that TEA must have colluded with TEM or TEL by transferring its service personnel and resources to TEM in an effort to circumvent the injunction. However, Tegal presented no evidence to support that theory—it offers only the fact that prior to entry of the injunction in August 2000 TEA provided around-the-clock service to its customers while TEM did not (at least as of June 1998), and that subsequent to entry of the injunction TEM provided around-the-clock service while TEA did not.

The district court did not adopt that theory in support of its decision, and we therefore decline to uphold the contempt sanction on that ground. Moreover, there is no evidence that TEA personnel are now employed by TEM or that TEA transferred any customer files, manuals, or other support materials to TEM to assist TEM in servicing the infringing etchers, either before or after the issuance of the injunction. Because there is no evidence supporting the contempt citation, the order finding TEA in contempt and imposing sanctions on TEA must be reversed.

*REVERSED.*