**ORGANON INC. and Akzo Nobel N.V., Plaintiffs,**

v.

**TEVA PHARMACEUTICALS, INC., Defendant.**

**Organon Inc. and Akzo Nobel N.V., Plaintiffs,**

v.

**Mylan Pharmaceuticals, Inc., Defendant.**

**Civil Action Nos. 01–2682, 01–2171 and 01–3835.**

United States District Court, D. New Jersey.

Dec. 18, 2002.

**OPINION**

HOCHBERG, District Judge.

This matter comes before the Court upon a Motion for Summary Judgment filed jointly by defendant Mylan Pharmaceuticals, Inc. ("Mylan") and defendant Teva Pharmaceuticals, Inc. ("Teva") (jointly "Defendants"), for judgment as a matter of law in favor of Defendants on plaintiff Organon Inc.'s ("Organon") and plaintiff Akzo Nobel N.V.'s ("Akzo") ("Plaintiffs") complaint for patent infringement.

The issue posed by the instant motion, at its core, concerns the clash of equally valid and important legal rights: the rights of pioneer pharmaceutical patent owners to enjoy the exclusivity granted by patent law in return for their significant and costly innovations in the advancement of science, and the rights of generic drug manufacturers to enter the market and compete to sell generic equivalents of patented drugs after the patents have expired.[1] In this case, the clash comes before this Court because, shortly before expiration of Plaintiffs' patent on Remeron (known generically as mirtazapine), Plaintiffs patented a new combined-use therapy of Remeron with a selective seratonin reuptake inhibitor ("SSRI").[2] Defendants, meanwhile, had already begun developing generic mirtazapine upon the expiration of the Remeron patent.

It is undisputed that it would be perfectly legal for Defendants to sell mirtazapine if its ultimate use was prescribed by doctors (and filled by pharmacies) as a single drug therapy. It also is undisputed that a doctor who prescribed a combined therapy of generic mirtazapine and an SSRI would infringe Plaintiffs' patent rights. Plaintiffs assert that the actions of Defendants in selling generic mirtazapine to pharmacies will result in the inability to protect their patent for the combined-use therapy because Plaintiffs will be unable to police a prescription written by a doctor and filled by a pharmacy for combined-use therapy

---

1. That pioneer pharmaceutical patent owners require legal protection is without question. Congress has manifested its support for pharmaceutical patent owners by enacting stringent patent laws to encourage the significant lead-time in research and in resources required in creating potentially life-saving drug therapies.

2. Prozac, Paxil, and Zoloft are several examples of SSRIs. Basically, SSRIs are monotherapies for depression, as is mirtazapine. The difference, according to the Plaintiffs, is that when these are used in combination they not only treat depression more effectively, but also reduce the side effects that often occur when an SSRI is used alone.

using the generic drug. Thus, Plaintiffs argue, notwithstanding that the great majority of prescriptions are for the use of mirtazapine either alone or combined with drugs other than SSRIs, which can lawfully be filled with the generic drug, Defendants Mylan and Teva cannot sell generic mirtazapine because doctors will also unlawfully prescribe the generic drug for combined-use therapy and pharmacists will fill those prescriptions. Where it is impracticable to police the line between the lawful and unlawful prescribing of generic mirtazapine by medical and pharmaceutical professionals, and Mylan and Teva know that some doctors will likely commit patent infringement, Plaintiffs argue, Defendants should be barred from all sales of the generic drug on the ground that such sales constitute inducement of patent infringement.

Defendants argue that they are merely selling a generic drug whose patent has expired; that they do not promote the generic for combined-use therapy; and that they take no steps to induce doctors or pharmacies to infringe Plaintiffs' combined-use patent. Thus, Defendants assert, it is not proper to bar them access to the vast lawful market for other uses of mirtazapine simply because some doctors and pharmacists may infringe Plaintiffs' patent rights. In sum, Defendants argue, the mere act of selling a bulk quantity of generic mirtazapine to pharmacies cannot constitute inducement to infringe without some other act encouraging doctors to infringe.

On December 3, 2001, this Court denied Mylan's and Teva's respective motions to dismiss, as premature, and ordered "that the parties proceed with focused discovery

on the issue of whether Defendant knowingly took active steps to induce others to infringe Plaintiffs' patent." At the conclusion of this phase of discovery, Mylan and Teva[3] were permitted to file motions for summary judgment solely as to this claim, which, if dispositive, would render it unnecessary to reach the remaining claims.

## I. BACKGROUND

This lawsuit is brought by Organon and Akzo pursuant to 35 U.S.C. § 271(e)(2), a provision of the Hatch–Waxman Act, which regulates the process to be used by the Food and Drug Administration ("FDA") in approving new and generic pharmaceutical drugs. The Supreme Court has bemoaned the Hatch–Waxman Act's inelegant draftsmanship, *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 679, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990), and it has taken years for courts to interpret its numerous statutory provisions. The stage was set for this action immediately upon the filing by Mylan and Teva of an Abbreviated New Drug Application ("ANDA") to produce generic mirtazapine, filed upon the expiration of Organon's patent for the drug, known by its trade name Remeron. About 18 months after the expiration of Organon's mirtazapine patent, and about 18 months before its extended exclusive marketing period expired, Organon obtained a patent for the combined drug therapy of mirtazapine administered jointly with an SSRI. Organon contends that the sale of generic mirtazapine will infringe this new patent for combined-use therapy.

### A. The Hatch–Waxman Act and Applications for New and Generic Drugs

In enacting the Drug Price Competition and Patent Term Restoration Act of 1984,

---

**3.** There are numerous other cases before this Court in which Organon has sued generic drug manufacturers for filing ANDA's to sell mirtazapine. This decision only affects Mylan

and Teva. This is a fact-intensive inquiry, which must be considered on a case-by-case basis, following discovery with respect to each generic manufacturer.

Pub.L. 98–417, 98 Stat. 1585, better known as the Hatch–Waxman Act, Congress responded to the problem of long delays in bringing generic drugs to consumers after patents had expired. In an effort to benefit consumers and generic drug makers, without discouraging the development of new drugs by pioneering pharmaceutical companies, a compromise was struck. *See Glaxo, Inc. v. Novopharm, Ltd.,* 110 F.3d 1562, 1568 (Fed.Cir.1997). "The Hatch–Waxman Act, *inter alia,* allows makers of generic drugs to market generic versions of patented drugs as soon as possible after expiration of the relevant patents, while providing patent holders with limited extensions of patent terms in order to recover a portion of the market exclusivity lost during the lengthy process of development and FDA review." *Id.*[4]

Before a pioneer pharmaceutical developer may market a new drug, it must obtain FDA approval. 21 U.S.C. § 355(a). This requires submission of a New Drug Application ("NDA"), which must detail the composition of the drug and the research done to test the drug's efficacy and safety. 21 U.S.C. § 355(b)(1). Because this application process is very long and expensive, the applicant for an approved NDA is granted an automatic five-year period of exclusivity to market that drug. 21 U.S.C. § 355(c)(3)(D)(ii). This is separate from any patent that the pioneer drug maker may already have, and runs concurrently. Thus, if a patent holder obtains FDA approval near the end of its patent term, it may extend the period of exclusivity by up to five years. This compensates the pioneer drug maker for the time spent doing the required testing for safety and efficacy, which in many cases takes up much of the patent term.

Although generic drug manufacturers must wait out the exclusive period granted to the pioneers, the process Hatch–Waxman created for them to obtain FDA approval thereafter is far less arduous. They file an ANDA, 21 U.S.C. § 355(j), which piggybacks on the pioneer's research by stating that the compound is the bioequivalent of the previously FDA-approved drug. 21 U.S.C. § 355(j)(4)(F); *see also Eli Lilly,* 496 U.S. at 675, 110 S.Ct. 2683 ("The ANDA applicant can substitute bioequivalence data for the extensive animal and human studies of safety and effectiveness that must accompany a full new drug application."). Bioequivalence refers to the extent and rate of the body's absorption of the active ingredient. 21 U.S.C. § 355(j)(8)(A). Prior to the enactment of the Hatch–Waxman Act, even uses of the patented drug solely to conduct the research in preparation for an FDA application were deemed infringements. *Roche Prod., Inc. v. Bolar Pharm. Co.,* 733 F.2d 858 (Fed.Cir.1984). Since the passage of Hatch–Waxman, generic drug manufacturers now may use patented drugs in any way that is necessary to the development of their generic version and the preparation of an ANDA. 35 U.S.C. § 271(e)(1) ("It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention ... solely for uses reasonably related to the development and submission of [an ANDA].") (overruling *Roche* ).

However, in order to protect the patent holders, a generic manufacturer who has benefitted from section 271(e)(1) must, if there is any unexpired patent on the drug identified in the ANDA, include a certification (known as a "Paragraph IV certifica-

4. Achieving the balance between competing policies in this area is a matter most appro-priately handled by Congress.

tion") stating either that the patent is invalid or that it will not be infringed by the sale of his product.[5] 21 U.S.C. § 355(j)(2)(A)(vii)(IV) (the ANDA shall contain a certification "that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted").[6] If the generic manufacturer files a paragraph IV certification, it must notify the patent-holder, 21 U.S.C. § 355(j)(2)(B)(i)(I), who then has forty-five days to initiate an action for infringement under 35 U.S.C. § 271(e)(2). 21 U.S.C. § 355(j)(5)(B)(iii). In order to allow courts to determine in advance whether the sale of a generic will infringe the patent listed in the Orange Book, § 271(e)(2) makes the filing of a paragraph IV certification automatically "an act of infringement." This allows courts to peer into the future at the likelihood of infringement once the generic is on the market, without a ripeness deficiency.

The § 271(e)(2) "infringement" is a "highly" artificial construct to create judicial jurisdiction. *Glaxo*, 110 F.3d at 1569. It does not in any way constitute a stationary standard of patent infringement. As the Supreme Court has noted, referring to the development of the procedural scheme created by section 271(e)(1):

**5.** It should be noted that there is some distortion between the plain language of this part of the statute and the practical realities faced by ANDA filers. The statute appears to require a paragraph IV certification only as to a patent which claims either the drug itself or "a use for such listed drug *for which the applicant is seeking [FDA] approval*" in the ANDA. 21 U.S.C. § 355(j)(2)(A)(vii) (emphasis added). At least one district court has interpreted this to mean that generic manufacturers filing an ANDA for an unpatented drug, which has a patented use for which they are not applying, need not file a paragraph IV certification. *See, Allergan, Inc. v. Alcon Laboratories, Inc.*, No. SA CV 02–40 DOC, 2002 WL 1009104 (C.D.Cal. May 8, 2002). Indeed, the statute has an alternate subsection, known as "little eight," which applies where ANDAs do not seek approval for the patented use. 21 U.S.C. § 355(j)(2)(A)(viii) (an ANDA must contain, "for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.").

However, this "little eight" section expressly applies when the patent holder has sought FDA approval for the patented use. Thus, by promoting the patented use as an off-label use, and never seeking FDA approval, a patent-holder can, as a practical matter, prevent an ANDA applicant from filing a "little eight" statement. This should not matter with regard to the plain language of subsection viii, applying itself only to ANDAs for a patented drug or for a patented use *for which approval*

*is sought,* but as a practical matter, it does. This is because the FDA requires a paragraph IV certification in the absence of a "little eight" statement where there is any patent at all relating to the ANDA. This practice has been upheld as a reasonable exercise of the FDA's discretion. *See, e.g., Mylan Pharms., Inc. v. Tommy G. Thompson*, 139 F.Supp.2d 1, 18, n. 14 (D.D.C.2001), *rev'd on other grounds*, 268 F.3d 1323 (Fed.Cir.2002).

As a result of this practice, holders of method-of-use patents can benefit by *not* seeking FDA approval for the patented use. By so doing, they force the generic manufacturers to file paragraph IV certifications, which then triggers the thirty-month extension that Hatch–Waxman adds to their period of exclusivity. (See further discussion, *infra* )

**6.** Generic manufacturers determine whether there is a patent that may be applicable to their ANDAs by reference to the "Orange Book," in which patent-owners list their patents in order to provide such notice. Despite that FDA regulations require that "[f]or patents that claim a method of use, the applicant shall submit information [to the Orange Book] only on those patents that claim indications or other conditions of use of a pending or approved [FDA-approval] application," 21 C.F.R. § 314.53(b), it is common for pioneers to list any and every patent they can obtain in the Orange Book so as to force generic manufacturers to file paragraph IV certifications. The FDA does not appear to have policed this practice.

This scheme will not work, of course, if the holder of the patent pertaining to the pioneer drug is disabled from establishing in court that there has been an act of infringement. And that was precisely the disability that the new 35 U.S.C. § 271(e)(1) imposed with regard to use of his patented invention only for the purpose of obtaining premarketing approval. Thus, an act of infringement had to be created for these ANDA ... proceedings. That is what is achieved by § 271(e)(2)-the creation of a highly artificial act of infringement....

*Eli Lilly,* 496 U.S. at 678, 110 S.Ct. 2683. In other words, section 271(e)(2) is a purely prophylactic measure to keep a potentially infringing product from getting into the stream of commerce before its relationship to the patent has been tested in court.

Not only does § 271(e)(2) create a cause of action, it also grants patent-holders an automatic thirty-month extension of exclusivity in the unpatented staple drug for which they have obtained a use-patent, by enjoining the sale of the generic for that long or until a court determines that there is no infringement, whichever is sooner. 21 U.S.C. § 355(j)(5)(B)(iii). This creates a strong incentive to file suit against the ANDA filer because there is no disgorgement provision for profits earned during the thirty-month period of exclusivity if a court determines that the suit is without merit.

In yet another congressional effort to balance the effects of the Hatch–Waxman Act, the Act creates what has been called a "bounty" for the first generic company to challenge these kinds of patents. In exchange for undertaking the legal challenge to clarify the application of the patent in court, the first generic company to file an FDA-approved ANDA (with a paragraph IV certification) is granted a 180–day period of exclusivity in relation to other generic manufacturers. 21 U.S.C. § 355(j)(5)(B)(iv).

## B. Mirtazapine

Mirtazapine is a tetracyclic antidepressant pharmaceutical compound that was disclosed and claimed in U.S. Patent No. 4,062,848 ("the '848 patent"), which expired on June 14, 1998. The '848 patent was at all times owned by an entity affiliated with one or both of the Plaintiffs. Mirtazapine, marketed as Remeron,[7] has primarily been used as a monotherapy to treat depression, or in combination with other (non-SSRI) drugs.

Organon owns New Drug Application ("NDA") 20–415 for mirtazapine and its use in treating depression, which the FDA approved on June 14, 1996. This approval created a five-year period of exclusivity in the sale of mirtazapine, which expired on June 14, 2001, pursuant to 21 U.S.C. § 355(c)(1)(D)(ii). Thus, Organon gained an additional three years of market exclusivity beyond that already created by the patent. The FDA approval only applies to the use of mirtazapine as a monotherapy, and does not apply to any combination therapy. In November 1999, plaintiff Akzo obtained a use-patent, numbered 5,977,099 ("the '099 patent"), for the combination therapy of mirtazapine together with an SSRI. Plaintiffs have never sought FDA approval for the combination therapy, which Organon markets for "off-label" use.[8]

---

7. Remeron is a trademark owned by Organon.

8. A use can only be put in the drug's packaging insert if it is FDA-approved. However, it can lawfully be prescribed by doctors for off-label uses.

## C. Factual and Procedural History

In 1998 and early 1999, Defendants Mylan and Teva made their internal decisions to develop generic mirtazapine for placement in the market after June 14, 2001. These decisions were based on the price and quantity of sales of Remeron, using very basic data. Defendants knew that the drug patent had expired, and that the three extra years of exclusivity were coming to an end. There was a sufficiently strong market for Remeron to be worth the cost of producing it generically. At that time, the only patent on mirtazapine was the '848 patent, which had just expired.

Later, in November 1999, plaintiff Akzo Nobel was granted the '099 patent on the combination of mirtazapine with an SSRI. By this time, both Mylan's and Teva's development work was well underway. Defendants did not actually become aware of the '099 patent for a substantial period of time after it was issued. An e-mail in February, 2001, between two high-level decision-makers for development at Mylan, evidences their newly acquired knowledge of the '099 patent on that date:

> Per today's electronic Orange Book update, an additional patent granted to Akzo Nobel in 11/99 was listed making the product an immediate Paragraph IV opportunity.[9] It seems that the patent pertains to mirtazapine in combination with an SSRI which certainly does not appear to apply to our product?

> I know we are extremely close to filing and prior to today, no one could file due to the NCE until 6/01.[10]

> How quickly can we file?

This email demonstrates the generic manufacturer's state of mind that the new patent did not apply to Mylan's product, and also indicates that, by the time the generic manufacturer learned of the Orange Book filing, the development period for the generic had been virtually completed and it was "extremely close to filing." Mylan filed its ANDA with a paragraph IV certification very quickly thereafter and Plaintiffs responded by filing the first of these actions on May 4, 2001, against Mylan.[11] Numerous other generic companies also have filed ANDAs for mirtazapine, and Plaintiffs have sued each of them as well.[12]

Plaintiffs allege infringement under 35 U.S.C. § 271(b), which states that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." Plaintiffs allege that, because doctors and pharmacists know that the generic products are the bioequivalent of Plaintiffs' product, they will substitute generic mirtazapine for Remeron for both unpatented uses and for the patented combination use. Thus, Plaintiffs argue, because Defendants know that doctors and pharmacists may infringe the '099 use patent, the act of taking lawful steps to sell their generic products in bulk to pharmacies constitutes an inducement to infringe. The result of such a legal conclusion would be to bar generics from the majority of non-infring-

---

9. The "paragraph IV opportunity" is a reference to the 180 days of exclusivity in generic marketing that may be obtained by being the first to file a paragraph IV certification.

10. Without a paragraph IV certification, an ANDA cannot be filed until the exclusive period expires.

11. The FDA tentatively approved both Defendants' ANDAs on January 15, 2002. As such, the pendency of these lawsuits (and the thirty-month stay created thereby) is the only barrier to the marketing of generic mirtazapine.

12. These cases, consolidated for pretrial proceedings before this Court, are in the process of fact discovery.

ing and thus lawful uses of mirtazapine. Defendants' response, in sum and substance, is that the basic act of putting generics on the market when a very substantial part of the market is not covered by the use-patent, cannot constitute inducement to infringe simply because third parties (i.e., doctors and pharmacists) may infringe by prescribing the generic part of combination therapy with an SSRI.

## II. STANDARD OF REVIEW

Pursuant to Rule 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, "[s]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.,* 843 F.2d 139, 143 (3d Cir.1988). All facts and inferences must be construed in the light most favorable to the non-moving party. *See Peters v. Delaware River Port Auth. of Pa. and N.J.,* 16 F.3d 1346, 1349 (3d Cir.1994).

Substantive law controls the inquiry into which facts are "material." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. An issue is "genuine" if a reasonable jury could decide the issue in the nonmovant's favor. *Id.* Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.; accord Ridgewood Bd. of Educ. v. M.E.,*

172 F.3d 238, 252 (3d Cir.1999) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Finally, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

## III. DISCUSSION

### A. Procedure for Patent Infringement Analysis

 There is a two-step analysis for determining whether a patent has been infringed. *Glaxo,* 110 F.3d at 1565. "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.,* 15 F.3d 1573, 1576 (Fed.Cir.1993). Claim construction is a question of law to be determined by the court. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979–81 (Fed.Cir. 1995) (*en banc*), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Determining whether the claim as construed is infringed by the accused product is a question of fact, *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1569 (Fed.Cir. 1983), and thus not easily dispensed with by summary judgment. That said, the burden is on the patentee to prove that each and every limitation of the patent as construed is found in the accused device. *Glaxo,* 110 F.3d at 1565.

There is no dispute in the present case that the '099 patent claims the use of

mirtazapine in combination with an SSRI, and the parties have so stipulated. As to the second step, there also is no dispute that Defendants' generic products will sometimes be prescribed by doctors to be used with SSRIs, and that Defendants have no control over doctors to absolutely prevent them from writing an infringing prescription.[13] The only real question in this case, therefore, is whether the Defendants' lawful steps to sell generic mirtazapine, which in turn will provide doctors and pharmacists access to the generic product for both infringing and non-infringing uses, constitutes inducement of infringement.[14] "The relevant inquiry is whether the patentee has proven by a preponderance of the evidence that the alleged infringer will likely market an infringing product. What is likely to be sold, or, preferably, what will be sold, will ultimately determine whether infringement exists." *Glaxo*, 110 F.3d at 1570. Here, the question is not *what* will be sold, but rather *how* it will be used, what *actions* on the part of Defendants will *cause* it to be used that way, and *why* the Defendants acted (or will act) in that manner.

## B. Burden of Proof

■ In their brief and at oral argument, Plaintiffs argued that the burden of proof has been shifted to Mylan and Teva. Plaintiffs' argument rests on the literal wording of § 271(e)(2) of the Hatch–Waxman Act, which states that it shall be an act of infringement to file an ANDA with a para-

graph IV certification. This interpretation stretches § 271(e)(2) far beyond its statutory construction by the Supreme Court. As stated above, this "highly artificial act of infringement" was held by the Supreme Court to have been created by § 271(e)(2) purely as a jurisdictional construct to enable patentees to get into court quickly before a potentially infringing product gets out into the market. *Eli Lilly*, 496 U.S. at 676–77, 110 S.Ct. 2683. The Federal Circuit has held that "the statute does not alter a patentee's burden of proving infringement." *Glaxo*, 110 F.3d at 1567. The appropriate analysis, therefore, is whether Plaintiffs have met their burden, during discovery, of adducing evidence sufficient to create a genuine issue of material fact, such that a jury could reasonably find by a preponderance of the evidence that Defendants have acted or will take action with the intent to induce others to combine their product with an SSRI.

## C. Inducement

■ "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). " 'Actively inducing,' like facilitating, requires an affirmative act of some kind." *Tegal Corp. v. Tokyo Electron Co., Ltd.*, 248 F.3d 1376, 1378 (Fed.Cir.2001). There must be "active steps, knowingly taken," for inducement of infringement. *Id.* It has been analogized to aiding and abetting in a criminal context. *See National Presto In-*

13. Indeed, Defendants argue that it is Plaintiffs who have a large corps of drug salespersons who visit doctors regularly and can most readily police their own patent.

14. This hypothetical future inquiry was held appropriate in *Bristol–Myers Squibb Co. v. Royce Laboratories, Inc.*, 69 F.3d 1130, 1135 (Fed.Cir.1995) ("section 271(e)(2) makes it possible for a patent owner to have the court determine whether, if a particular drug *were*

put on the market, it *would* infringe the relevant patent."). While a recent district court decision held that this future inquiry cannot meet the case or controversy requirement when applied to *inducement, Allergan, Inc. v. Alcon Laboratories, Inc.*, 200 F.Supp.2d 1219 (C.D.Cal.2002), such an analysis is not outcome-determinative in this case, and this Court will proceed to analyze the claim of inducement of patent infringement.

*dus., Inc. v. West Bend Co.,* 76 F.3d 1185, 1196 (Fed.Cir.1996); *see also Symbol Techs., Inc. v. Metrologic Instruments, Inc.,* 771 F.Supp. 1390, 1404 (D.N.J.1991) ("In order to find active inducement under § 271(b), intent to aid and abet must first be proven."). Finding an act is only the first step of the inquiry; the second is to determine intent. "Thus, a person infringes by actively and *knowingly* aiding and abetting another's direct infringement. Although section 271(b) does not use the word 'knowing,' the case law and legislative history uniformly assert such a requirement." *Water Techs. Corp. v. Calco, Ltd.,* 850 F.2d 660, 668 (Fed.Cir.1988) (emphasis in original). The intent element may be proven by circumstantial evidence. *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1272 (Fed.Cir.1986).

### 1. Active Steps

■ Plaintiffs allege that the "active steps" to induce infringement of their patent are: 1) that Defendants filed an ANDA calling their product the bioequivalent of Remeron; 2) that Defendants considered the total sales data for Remeron in making their decision to develop a generic version, and continue to do so; 3) that Defendants will market their product as an across-the-board substitute for Remeron for all uses; and 4) that Defendants will offer their products at a lower price than Remeron.

*Step 1:* This act is the perfectly legal step of filing an ANDA, set forth by Congress as the proper means to proceed. The Hatch–Waxman Act tells Mylan and Teva that this is a correct way to develop a generic drug, and they followed the law.

*Step 2:* The second alleged "act" is not an act that might induce others to infringe, but rather potential evidence of intent, to be discussed below.

*Step 3:* Plaintiffs have failed to point to any evidence in the record to support the third alleged act of inducement. While market practice evidence does suggest that Defendants will market generic mirtazapine to large pharmacy chains as an AB-rated bioequivalent of Remeron, this is the only realistic way to market their product at all. Obtaining the AB rating is a perfectly lawful step, created and regulated by the FDA. There is *no* evidence adduced by Plaintiffs that Defendants will advise any pharmacies (or anyone else) to substitute generic mirtazapine for combination use therapy with an SSRI. It is notable that Plaintiffs made the deliberate choice *not* to apply for FDA approval of their combination therapy. If they had chosen to apply for FDA approval, Plaintiffs could have differentiated their product from the generic product by a packaging insert and label stating Remeron's approved use for combination therapy with an SSRI. The generic manufacturers could *not* have placed in their packaging inserts such an approved use, and generics would have had to file "little eight" statements to carve SSRI combination therapy *out* of their applications to make generic mirtazapine. Instead, Plaintiffs strategically opted to force the generic companies to file paragraph IV certifications, and thereby gain thirty extra months of exclusivity, rather than to differentiate their new patented use. Having chosen the path to thirty months of exclusivity rather than product differentiation, Plaintiffs cannot now claim that the resulting lack of product differentiation constitutes inducement of infringement. The ability to create product differentiation was solely within Plaintiffs' power.

*Step 4:* The fourth alleged act, price competition, is a legitimate method of competing in the marketplace, and is encouraged, *inter alia,* by Hatch–Waxman.

This Court notes that the facts of this case are similar to those of *Warner–Lambert Co. v. Apotex Corp.*, 2001 WL 1104618 (N.D.Ill.2001), which granted summary judgment in favor of Defendants (generic makers) against plaintiff's claim "that Defendants' manufacture and sale of their generic gabapentin product will induce infringement" of plaintiff's patent. *Id.* at *3.

> Apotex Corp. markets [generic] products to wholesalers, warehousing chains, mail order organizations and group purchasing organizations. It does not market any [generic] products directly to doctors. Apotex Corp.'s advertisements, which are placed in sales and marketing pharmaceutical journals, do not encourage any specific use for [the generic] drugs. Apotex Corp. has not researched off-label uses of gabapentin and has not funded any research on gabapentin or any professional meetings where doctors might discuss gabapentin and its uses. Moreover, plaintiff's own expert opined that doctors learn about off-label uses from professional meetings and conferences, formal studies, medical literature, case reports and discussions with colleagues, not from drug companies. In short, there are no facts to suggest that Defendants took any steps to encourage doctors to write gabapentin prescriptions for [the patented use].

*Id.* All of this is also true of Defendants Mylan and Teva with regard to mirtazapine. There is simply no evidence in the record upon which to prove to a reasonable jury that Defendants have taken, or will likely take, active steps to encourage others to infringe the '099 patent.[15]

### 2. Intent

■ The Federal Circuit has held "that proof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement." *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed.Cir.1990). "It must be established that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement. The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 553 (Fed.Cir.1990). In other words, the knowledge must be of the resulting infringements themselves; in the instant case, it would be knowledge of the existence of the use-patent, coupled with knowledge that some doctors will prescribe generic mirtazapine with an SSRI, plus an act (other than the mere existence of the generic on the market) to induce doctors to commit the infringing act. Sale of a lawful product by lawful means, with the knowledge that an unaffiliated, third party may infringe, cannot, in and of itself, constitute inducement of infringement.

Plaintiffs contend that the fact that Defendants used the total Remeron sales data in deciding to develop and market generic mirtazapine is evidence of their intent to benefit from infringing uses. Although this Court construes the facts and inferences therefrom in the light most favorable to Plaintiffs, the record does not

---

**15.** Although not required of them by law, Defendants have even offered, on the record at oral argument, to market their product as being *solely* for use as a monotherapy, which would sacrifice the significant portion of the market in which mirtazapine is combined with drugs other than SSRIs. Moreover, if evidence were later to develop that Defendants were marketing their product for combination use with an SSRI, Plaintiffs would not be estopped from suit for inducement of infringement at that time.

reasonably support any such inference on the specific facts derived from discovery of Teva's and Mylan's business records. The sales data Defendants used was from *before* the use-patent was even issued, and they used it with no knowledge of the pending patent. There is no burden on generic companies to cease development of a generic drug when they later learn of a use-patent on that drug, nor to reconsider their market analysis. On the facts of this case, Defendants could not *intend* to induce infringement of a patent that did not exist when their decisions were made, nor could they intend to induce infringement of a use-patent of which they were unaware, during the remainder of the development period.

Plaintiffs alternatively argue that this very lawsuit itself has provided Defendants with all the information they need to have the requisite intent to infringe: the existence of the patent, the data showing that a twenty-three percent of Remeron sales are made in combination with an SSRI,[16] and the discussions of the common practice of across-the-board substitution of generics. If Mylan and Teva did not know before, suggest Plaintiffs, they surely know now, so their decision not to discontinue their plan to sell the generic mirtazapine now is an act of infringement. This rather bold argument was wisely rejected in a case that was even further along its timeline, with the product already being sold and the doctors already prescribing it for the allegedly infringing use. *See Cata-* *pano v. Wyeth Ayerst Pharms., Inc.,* 88 F.Supp.2d 27 (E.D.N.Y.2000).

Here, the Court assumes, without necessarily finding, that Catapano's allegation that "doctors, hospitals and others in the medical field" are using the vaccine for the purpose of immune system stimulation in violation of his patent is sufficiently specific to allege a claim for actual infringement against these anonymous non-party "doctors, hospitals, and others in the medical field." However, even when viewed in the light most favorable to him, Catapano's complaint fails to allege that the Defendants specifically intend to encourage this behavior. Even if the Defendants are aware that doctors and hospitals are using the vaccine to stimulate patients' immune systems in violation of Catapano's patent, such knowledge alone does not suffice to hold the Defendants liable for inducement.

*Id.* at 30 (citing, for the proposition that "mere knowledge that its customers use its products in the infringing manner does not demonstrate the requisite intent for claim of inducement," *R2 Medical Systems, Inc. v. Katecho, Inc.,* 931 F.Supp. 1397, 1440 (N.D.Ill.1996)).

Plaintiffs rely upon an unreported opinion from the Southern District of New York, *In re Omeprazole Patent Litigation* (opinion of July 6, 2001)(not identifiable by citation because it was not placed on Westlaw and Lexis where it could have

---

**16.** Plaintiffs submit data which they urge should be construed to mean that twenty-three percent of all Remeron sold is combined with an SSRI. This data is not without flaws. It lists the drugs a doctor "mentions" in a particular visit. Thus, if a doctor treating a patient for depression suggests that the patient use *either* mirtazapine *or* an SSRI, *both* will be listed as "mentions," and will count toward Plaintiffs' twenty-three percent figure, whether or not combination therapy is actual- ly prescribed. It will also count as a "mention" if the doctor discusses it, but decides to prescribe no medicine or another medicine. Thus, the twenty-three percent figure is inflated. Nonetheless, the reasoning of this decision would not differ even if the data were to support an inference that twenty-three percent of the market for mirtazapine is in SSRI combination therapy, because seventy-seven percent of the market would still not be covered by any patent exclusivity.

received an unreported opinion reference number). In that case, the court did not grant the defendants summary judgment where the court noted that in "almost all" cases where the unpatented drug is needed (for gastritis), the patented therapy also is needed (for H. Pylori infections, which are the usual result of gastritis). This is clearly distinguishable from the present case, as there is a significant market for non-infringing uses of mirtazapine. As for intent, the *Omeprazole* court relied on *Mendenhall v. Astec Indus., Inc.*, 887 F.2d 1094 (Fed.Cir.1989), for the proposition that "absence of direct instruction on infringement to customers, even if proved, does not foreclose [a] finding of active inducement where the intended use of products would be readily apparent to the customer." This is part of a line of cases that deal with inducement by hinting and obviousness rather than actual instructions to infringe (and generally in such cases, as in *Omeprazole,* the hint is clear because there is little or no market for the non-infringing use alone). Here, where Plaintiffs have made no showing that Defendants will, by marketing generic mirtazapine, be "hinting" or "nudging" or "winking at" the doctors and pharmacies to use it in combination with an SSRI, these cases are inapposite. Plaintiffs have not met their burden of adducing facts sufficient to prove to a reasonable jury that Defendants have acted, or will take action, with the intent to cause others to infringe the '099 patent.

## IV. CONCLUSION

For the forgoing reasons, Mylan and Teva's joint motion for summary judgment is hereby GRANTED.