**ASPEX EYEWEAR, INC., Contour Optik, Inc., Plaintiffs**

v.

**ALTAIR EYEWEAR, INC., Defendant**

**No. 02 CIV. 6195(SCR).**

United States District Court, S.D. New York.

March 7, 2005.

Matthew C. Wagner, Collen Intellectual Property Law, P.C., Ossining, NY, for Plaintiffs.

Brian G. Bodine, Kaustuv M. Das, Vitaliana Conforti, Davis Wright Tremaine LLP, Seattle, WA, Edward J. Davis, Davis, Wright, Tremaine LLP, New York, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

ROBINSON, District Judge.

### I. Background

#### A. Factual History

Aspex Eyewear, Inc. ("Aspex") is a Delaware corporation engaged in the distribution of eyewear, including certain auxiliary lenses which engage primary frames via magnetic attraction, as opposed to mechanical "clips," at the bridge region. Contour Optik, Inc. ("Contour"; Aspex and Contour are collectively referred to herein as the "Plaintiffs") is a Taiwanese corporation owned by the family of Richard and David Chao, who are the named inventors of patents at issue in this case.

Altair Eyewear, Inc., ("Altair" or "Defendant") is a California corporation also engaged in the distribution of eyewear. Altair is a wholly-owned subsidiary of Vision Services Plan ("VSP"), which is also a California corporation.

Aspex allegedly derives all of its rights with respect to the resale of bridge mounted magnetic eyewear from its Canadian sister company, Chic Optik ("Chic"). Both Chic and Aspex are owned and operated by the Ifergan family. Nonu Ifergan, a resident of Montreal, Canada, is the President of both companies. Thierry Ifergan, Nonu Ifergan's son, is the Executive Vice President of Aspex and a resident of Florida, Aspex's principal place of business.

On March 26, 1998, Chic and Aspex entered into a License Agreement ("Chic–Aspex Agreement"), which contains the following language:

> LICENSOR [Chic] grants to LICENSEE [Aspex] an exclusive license to make, use, sell or have made products under the LICENSED PATENTS including all divisional, continuations, continuations-in-part, continuing patent

applications (whether related to such application(s) directly or through one or more intervening applications), extensions or reissues of said licensed patents, and any patent which may issue thereon. LICENSOR shall update and advise the LICENSEE when pending patent applications which are divisional, continuations, continuations-in-part, extensions or reissues of the LICENSED PATENTS have been filed or have issued as patents (whether related to such application(s) directly or through one or more intervening applications).

Although the Chic–Aspex Agreement does not include a separate provision expressly defining "LICENSED PATENTS," it includes the following statement: "WHEREAS, LICENSOR [Chic] is the owner of the rights ("LICENSED PATENTS") embodied in various Agreements ("LICENSOR'S AGREEMENT") relating to magnetic eyewear for eyeglasses."

This case involves the alleged infringement of three patents: 1) United States Patent No. 5,737,054, entitled "Auxiliary Lenses for Eyeglasses" (the "'054 Patent"), which was issued by the PTO on April 7, 1998; 2) United States Patent No. 6,012,811, entitled "Eyeglass Frames with Magnets at Bridges for Attachment" (the "'811 Patent"), issued on January 11, 2000; 3) United States Patent Number 6,092,896, entitled "Eye-wear With Magnets" (the "'896 Patent"), issued on July 25, 2000 (the '054 Patent, '811 Patent and the '896 Patent are collectively referred to herein as the "Patents–in–Suit").

Richard Chao is the named inventor of the '054 Patent. Richard Chao and his brother David Chao are the named inventors of the '811 Patent and the '896 Patent. On July 31, 1998, after the Chic–Aspex Agreement was executed, Richard Chao granted Chic an exclusive license to then Patent Applications 08/766,327 and 08/963,-299, from which the Patents–in–Suit ultimately issued. In July 1999, the Chaos assigned their ownership interests in the Patents–in–Suit to Contour.

## B. Procedural History

The Plaintiffs filed their complaint in this action in August 2002, alleging violations of United States patent laws, 25 U.S.C. §§ 271, 281, 283. They filed an amended complaint later that month, which the Defendant answered in September 2002. Along with its answer, the Defendant made counterclaims against both Plaintiffs. The case was initially assigned to the docket of Judge Koeltl, but was reassigned to this court in September 2003.

In August 2004, the Defendant moved for partial summary judgment that Plaintiff Aspex does not have standing to sue for infringement of the Patents–in–Suit. Shortly thereafter, the Plaintiffs filed a motion, pursuant to Rule 19 of the Federal Rules of Civil Procedure, to add VSP as a defendant in this matter.

## II. Analysis

### A. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when "there is no genuine issue as to any material fact[.]" FED. R. CIV. P. 56(c). Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment is as appropriate in a patent case as it is in any other. See Union Carbide Corp. v. American Can Co., 724 F.2d 1567, 1571 (Fed.Cir.1984).

### B. Defendant's Motion For Partial Summary Judgment Against Plaintiff Aspex For Lack Of Standing

Whether a plaintiff has standing to bring suit is a question of law, reviewed de novo. *Consol. Edison Co., v. Richardson*, 233 F.3d 1376, 1379 (Fed.Cir.2000). Under United States patent law, only "a patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. The term patentee includes "not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d). The Plaintiffs have the burden of demonstrating standing. *See Ortho Pharmaceutical Corp. v. Genetics Inst.*, 52 F.3d 1026, 1032–33 (Fed.Cir.1995).

Where a patentee makes an assignment of all significant rights under a patent, such assignee may be deemed the effective "patentee" under the statute and has standing to bring a suit in its own name for infringement. *See Ortho*, 52 F.3d at 1031. In addition to assignees of all significant patent rights, holders of exclusive licenses also have standing. *See id.* at 1032. In contrast, holders of non-exclusive licenses have no right to exclude others and, as such, have no standing to sue for infringement. *See id.* at 1031.

Federal Circuit precedents suggest that there are two kinds of exclusive licensees for the purpose of standing: 1) exclusive licensees who are "virtual assignees" and can, as a result, sue for patent infringement in their own names; and 2) other exclusive licensees who can sue only as co-plaintiff with the patentee. In order to be a "virtual assignee," it is clear that, at the very least, the exclusive licensee must have received his patent rights via a written instrument executed prior to bringing suit. *See Enzo APA & Son v. Geapag A.G.*, 134 F.3d 1090, 1093–94 (Fed. Cir.1998). The requirements for other ex-

clusive licensees, who sue as co-plaintiff with the patentee, appear to be less onerous, however.

The Defendant, apparently rejecting any distinction between exclusive licensees, argues that any exclusive licensee must have been granted its exclusive license prior to filing suit regardless of whether the patentee is a co-Plaintiff in its case. The court disagrees. In *Waymark Corp. v. Porta Sys. Corp.*, the court directly confronted the argument that Waymark Corp., one of the plaintiffs in the underlying patent infringement suit, did not have standing to allege infringement of the patent at issue because no written exclusive license agreement existed at the time the case was filed. 334 F.3d 1358, 1364 (Fed.Cir.2003). The court rejected that argument summarily, explaining that it was "not a correct statement of the law." *Id.* Crucially, the court noted that another entity, the Caravello Partnership, which was Waymark's co-plaintiff in the underlying infringement action, had claimed a written assignment of the patent and, therefore, had standing to bring the action and join Waymark as a co-plaintiff. *See id.* Under these circumstances, it did not matter to the court that Waymark could allege that it was the holder of only an oral exclusive license because "[o]nly assignments need be in writing" while "[l]icenses may be oral." *See id.*

This interpretation of *Waymark* is consistent with *Enzo* because, in *Enzo*, the only plaintiff in the underlying patent infringement action was the exclusive licensee—the patentee was not joined. *See* 134 F.3d at 1091–92. Given that the underlying plaintiff had, at most, an oral exclusive license or a nunc pro tunc license executed after suit was brought, the court concluded that the holder of title must be joined in order to confer standing. *See Enzo*, 134 F.3d at 1093. The court did not hold,

however, that the plaintiff could not have standing under any circumstances.

*Enzo*, it is crucial to note, is not this case, because here Aspex joined Contour, the assignee of the rights to the Patents–in–Suit, as co-Plaintiff, and no party appears to challenge Contour's standing to sue. In light of this, Aspex has premised its argument for standing on two separate sources of patent rights: 1) the Chic–Aspex Agreement [1]; and 2) oral and implied agreements between Contour, Chic and Aspex.

■ The Chic–Aspex Agreement is a problematic source of license rights, though, because it was executed before Chic had any rights to the Patents–in–Suit. As a result, Plaintiffs are left to contend that the Chic–Aspex Agreement conveyed an exclusive license not only to rights relating to magnetic eyewear that Chic held on March 26, 1998, the day the Agreement was executed, but also to any rights it acquired in the future. The court, however, disagrees. The Agreement's language, cited above, refers only to patents that are already in existence or patents that derive from or are related to patents already in existence. The Agreement's only description of the "LICENSED PATENTS"

owned by Chic is in the present tense, and specifically provides that Chic "*is* the owner of the rights...embodied in various Agreements..." (emphasis added). There is, moreover, no reference to the Patents–In–Suit or to any applications that later issued as the Patents–In–Suit, or any language that could in any way be construed as granting, or indicating an intention to grant, any future acquired rights.[2] Therefore, it is clear that the Chic–Aspex Agreement does not transfer rights to any patents acquired after its execution.[3]

■ In the alternative, Plaintiffs contend that Aspex acquired, in a timely fashion, exclusive rights to the Patents–in–Suit via long-standing oral and/or implied agreements between Aspex, Contour and Chic. In light of *Enzo*, *Waymark*, and the facts of this case, this argument is persuasive. It is undisputed that Chic and Aspex are both owned by members of the same family and have, at all times, had a close business relationship. Plaintiffs argue, and Defendant does not appear to contest, that Aspex has operated as exclusive licensee ever since Chic formally obtained its rights and, as such, has both distributed products made according to the Patents–in–Suit and enforced patent rights on

---

1. As a written instrument executed prior to filing suit, the Chic–Aspex Agreement could, in theory, provide the basis for standing as a "virtual assignee."

2. As the Defendant points out, other District Courts have also concluded that the Chic–Aspex Agreement did not grant any future-acquired rights. *See Aspex Eyewear, Inc. et. al. v. E'Lite Optik, Inc.*, No. 00 Civ. 1116 (D. Nev. Filed Aug. 5, 2003); *Aspex Eyewear, Inc. et. al. v. Miracle Optics, Inc.*, No. 01 Civ. 10396 (C.D. Cal. filed Feb. 6 2004).

3. Plaintiffs also argue that, in the very least, the extent to which the Chic–Aspex Agreement covers future-acquired rights is a disputed material fact that a jury must resolve. But the interpretation of contractual language, in-

cluding licensing agreements, is a question of law. *See Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1569, 27 U.S.P.Q.2D (BNA) 1136, 1138 (Fed.Cir.1993); *Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381, 1384, 37 U.S.P.Q.2D (BNA) 1884, 1887 (Fed.Cir.1996). To the extent Plaintiffs are arguing that the court should consider statements by Nonu and Thierry Ifergan in which they claim that it was their intention, at the time of drafting, that the Chic–Aspex Agreement transfer future rights in magnetic eyewear, the court finds that it cannot do so in this case. If the provisions of the contract are clear and unambiguous, as they are here, the court will generally not resort to parol evidence. *See Forman v. United States*, 329 F.3d 837, 842 (Fed.Cir.2003).

Chic's behalf. Moreover, there is testimony from Thierry Ifergan confirming oral and implied agreements with Chic granting exclusive licenses to the Patents–in–Suit, which is credible in light of the nature of the business relationship between Chic and Aspex and, in particular, Aspex's apparent role as Chic's United States distributor. *See Kalman v. Berlyn Corp.*, 914 F.2d 1473, 1481–82 (Fed.Cir.1990). There is, without doubt, more than enough evidence on which a reasonable jury could believe that there was an oral and/or implied exclusive license between Chic and Aspex.[4]

For these reasons, Defendant's motion for partial summary judgment dismissing Plaintiff for lack of standing is denied.

## C. Plaintiffs' Rule 19 Motion To Add VSP, Altair's Parent Corporation, As A Party Defendant

The Federal Rules of Civil Procedure provide that "[a] person . . . shall be joined as a party in the action if . . . in the person's absence complete relief cannot be accorded among those already parties . . . ." FED. R. CIV. P. 19(a). In this case, Plaintiffs argue that VSP should be joined because 1) if VSP is not named, Plaintiffs would be unable to obtain the legal and equitable relief they are seeking; and 2) VSP dominates Altair, its subsidiary, to such a degree that this court should pierce the corporate veil between them.

■ Plaintiffs argue that they cannot obtain complete relief from Altair because "[t]he unity between VSP and Altair is such that to the extent Altair had infringed the patents-in-suit, VSP has infringed the

patents in suit." Plaintiffs have not claimed that VSP has in any way distributed allegedly infringing products, but instead claim that VSP should be joined as a Defendant because it approved, authorized, and failed to prevent Altair's sale of allegedly infringing products. But allegations of this kind, without more, do not justify the addition of a corporate parent in a suit against its subsidiary. *See Tegal Corp. v. Tokyo Electron Co.*, 248 F.3d 1376, 1380 (Fed.Cir.2001) (a company has no affirmative obligation to stop its corporate affiliates from selling or servicing infringing products in the absence of proof that it controlled those affiliates); *A. Stucki Co. v. Worthington Industries, Inc.*, 849 F.2d 593, 596–97 (Fed.Cir.1988) (in the absence of evidence showing that the parent company either was an alter ego of the subsidiary or controlled the conduct of the subsidiary, a parent company is not liable for direct infringement for mere inaction in the face of infringement by a subsidiary).

In light of this, the issue becomes whether VSP has sufficient control over Altair's activities that it should be held responsible for Altair's alleged infringement. On this issue, Federal Circuit precedents are not entirely clear about which standard to apply. In particular, it is not clear whether the Federal Circuit distinguishes between the kind and degree of control talked about in *Tegal* and *Stucki* and the standard traditionally applied for piercing the corporate veil and, if the Federal Circuit does draw a distinction, which standard to apply in this context. In *Stucki*, the court stated that a parent could

---

4. This conclusion is, of course, different from that reached by the other District Courts discussed in footnote 2, all of whom held that Aspex had no standing to sue. The Nevada court's opinion, which deals with the Patents–in–Suit, contains no discussion of the alleged oral/implied exclusive license, which may ex-

plain its differing result. To the extent the Nevada court, or any other court, considered these issues, as the Nevada court may have before denying Aspex's motion for reconsideration in that case, this court respectfully disagrees.

be liable for its subsidiary's infringement "only if the evidence reveals circumstances justifying disregard of the[ir] status...as distinct, separate corporations," 849 F.2d at 596, and then cited *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.* for the proposition that "[t]o determine whether corporate officers are personally liable for the direct infringement of the corporation...requires invocation of those general principles relating to piercing the corporate veil." 806 F.2d 1565, 1579 (Fed.Cir. 1986). In *Tegal,* however, the court characterized *Stucki* as refusing to hold a parent corporation liable in the absence of evidence that "the parent company either was an alter ego of the subsidiary *or* controlled the conduct of the subsidiary," 248 F.3d at 1379 (emphasis added), and later noted the lack of any evidence in the case before it that the corporation "formulates, directs, or controls [the affiliate's] operations or that it is in control of the management, policies, and operation" of the affiliate." 248 F.3d at 1380.

 Nevertheless, the clearest statement from these cases suggests that the standard for piercing the corporate veil must be met before a parent may be held liable for the acts of its subsidiary, and therefore the court will apply that standard in this case. In determining whether a corporate veil should be pierced, the court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception. See *Manville Sales Corp. v. Paramount Systems, Inc.,* 917 F.2d 544, 552 (Fed.Cir. 1990). A court may disregard the corporate entity if it decides that piercing the veil will prevent fraud, illegality, injustice, a contravention of public policy, or prevent the corporation from shielding someone from criminal liability. *See Manville,* 917 F.2d at 552. Unless there is at least specific intent to escape liability for a specific

tort, the cause of justice does not require disregarding the corporate entity. *See id.*

 Applying that standard to this case, the court finds that there is no basis to pierce the corporate veil, and VSP should not be held liable for Altair's alleged conduct or, as a result, added as a party defendant. In essence, Plaintiffs claim that this court should pierce the corporate veil between VSP and Altair because the two corporations share some common officers and directors, customers and office space, and because VSP has participated in Altair's defense in this action, oversees Altair's business activities, and has the operational authority to prevent Altair from selling certain products. But these allegations, individually or collectively, do not reach the level required to pierce the corporate veil.

The Plaintiffs have offered no evidence that recognizing the separate corporate existences of Altair and VSP would permit VSP to commit fraud and illegitimately escape liability to the Plaintiffs in this case. There is no evidence that VSP has undercapitalized Altair or diverted assets from it in order to avoid liability. In fact, the record suggests that Altair has observed corporate formalities, including having its own articles of incorporation and by-laws and holding its own meetings. Moreover, the record indicates that Altair maintains its own finances, while there is nothing to suggest that VSP dominates the day-to-day existence and operations of Altair. The record is, therefore, woefully inadequate to justify the extraordinary remedy the Plaintiffs seek.

Finally, it is worth noting that, even if the relevant amount of control needed to hold VSP liable is somewhat less than that required to justify piercing the corporate veil, the Plaintiffs would still fall short. As mentioned, they have, at most, alleged that VSP had the power to prevent infringing

conduct by Altair. The power to merely stop a subsidiary from selling a certain product is a far cry from the power to formulate, direct, or control an affiliate's operations, management and policies, *see Tegal*, 248 F.3d at 1380, and should certainly not be sufficient to make one liable. Were this court to enjoin Altair from infringing the Plaintiffs' patents, VSP's encouragement that Altair comply with such an order would, the court expects, not be necessary.

For these reasons, Plaintiffs' motion to join VSP as a party defendant is denied.

### III. Conclusion

For these reasons, Defendant's motion for partial summary judgment is DENIED. Plaintiffs' motion to add an additional party defendant is also DENIED.

It is so ordered.